UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **H. WOOD GROUP, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-1830** |
| **ALLISON & GLENN, INC.** | **SECTION: "P" (2)** |

**ORDER AND REASONS**

Before the Court is Defendant's Motion for Summary Judgment.[1] For the reasons that follow, **IT IS ORDERED** that the Motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.    BACKGROUND**

Plaintiff, h. Wood Group, LLC ("HWG"), brought this action under the Lanham Act seeking to enforce its trademark, THE NICE GUY, which serves as the name of its flagship restaurant in West Hollywood, California.[2] HWG alleges that Defendant, Allison & Glenn, Inc. ("A&G"), is infringing upon its trademark by using the name "Nice Guys NOLA," for a restaurant in New Orleans, Louisiana.[3]

H. Wood Group obtained the registered trademark for THE NICE GUY with the United States Patent and Trademark Office ("USPTO") on November 4, 2014, and began using the mark in connection with its West Hollywood restaurant shortly thereafter.[4] HWG also uses the trademark for a restaurant it opened in Dubai, United Arab Emirates, in 2022, and plans to open a third location in Miami, Florida, in 2026.[5]

---

[1] R. Doc. 35.
[2] R. Doc. 1 at ¶ 2.
[3] *Id.* at ¶ 3.
[4] R. Doc. 35-4 at 4.
[5] *Id.* at 4.

A&G began operating a restaurant under the trade name "Nice Guys Bar & Grill" in 2019 and, by October 27, 2020, the restaurant was called "Nice Guys NOLA."[6] "Nice Guys NOLA" was registered with the Louisiana Secretary of State on December 5, 2020, but A&G has not attempted to register that name as a trademark with the USPTO.[7] HWG first learned of Nice Guys NOLA in mid-2022, when a customer wrote to HWG and asked if Nice Guys NOLA was an affiliated restaurant.[8] A&G was unaware of HWG's trademark until it received a letter from HWG.[9]

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] A party seeking summary judgment must show there is no genuine dispute of fact by citing specific parts of the summary judgment materials or by showing that the adverse party cannot produce admissible evidence to support its alleged facts.[11] A party opposing summary judgment must set forth specific facts showing there is a genuine issue of material fact that must be resolved at trial.[12] A movant is entitled to summary judgment by virtue of a favorable ruling on a single essential element of a claim with respect to which the nonmoving party has the burden of proof.[13] "When assessing whether a dispute to any material fact exists, [courts] consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[14]

---

[6] R. Doc. 35-3 at 2-3.
[7] *Id.*
[8] R. Doc. 35-4 at 5.
[9] R. Doc. 35-3 at 4-5.
[10] FED. R. CIV. P. 56(a).
[11] FED. R. CIV. P. 56(c).
[12] *Id.*
[13] *Carnegie Techs., L.L.C. v. Triller, Inc.*, 39 F.4th 288, 293 (5th Cir. 2022) (quoting *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021)).
[14] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

### III.   LAW AND ANALYSIS

#### A. HWG's Lanham Act trademark infringement claim

A plaintiff bringing a Lanham Act trademark infringement claim must satisfy two prongs: (1) that the plaintiff has ownership in a legally protectible mark; and (2) that infringement occurred by demonstrating a likelihood of confusion.[15] For the purpose of its motion, A&G does not challenge HWG's ownership of THE NICE GUY mark.[16] To determine likelihood of confusion, courts weigh a non-exhaustive list of eight "digits of confusion" to determine the likelihood of confusion: (1) type of mark allegedly infringed; (2) similarity between the two marks; (3) similarity of the products or services; (4) identity of the retail outlets and purchasers; (5) identity of the advertising media used; (6) defendant's intent; (7) evidence of actual confusion; and (8) degree of care.[17] "Whether the challenged mark is likely to cause confusion 'is a question of fact' and is one that ordinarily 'assails' the conclusion that summary judgment is the appropriate vehicle for disposition."[18] The Fifth Circuit has emphasized that a plaintiff need only "show a genuine issue as to *likelihood* of confusion," not actual confusion, to survive summary judgment.[19]

*i.   Type of mark*

The first digit, referring to the mark's strength, is determined by two factors: (a) the mark's distinctiveness on a continuum from generic to fanciful, and (b) the mark's standing in the

---

[15] *Bd. of Supervisors for La. State Univ. Agric. and Mech. Coll. v. Smack Apparel*, 550 F.3d 465 (5th Cir. 2008).
[16] R. Doc. 35-1 at 6.
[17] *Smack Apparel*, 550 F.3d at 478.
[18] *Lettuce Entertain You Enters., Inc. v. Hotel Magdalena Joint Venture, L.L.C.*, No. 23-50319, 2024 WL 3274787, at *2 (5th Cir. July 2, 2024) (quoting *Socy' of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs*, 41 F.3d 223, 225 (5th Cir. 1995)).
[19] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 231 (5th Cir. 2009).

marketplace.[20] Taken together, a mark's distinctiveness and standing in the marketplace determine its strength; "[s]trong marks receive 'the widest ambit of protection,' and weak marks do not."[21]

The continuum of distinctiveness refers to five categories of ascending distinctiveness describing the relationship of a mark to its product or service: generic, descriptive, suggestive, arbitrary, and fanciful.[22] A generic term is one that "connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product."[23] A descriptive marks conveys "an immediate idea of the qualities, characteristics, effect, purpose, or ingredients of a product or service."[24] One such example is "Vision Center," referring to a business offering optical supplies and services.[25] A suggestive mark "requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods,"[26] like Coppertone describing sun tanning products.[27] An arbitrary or fanciful term does not relate to the product or service.[28] Ivory has been classified as an arbitrary term because it bears no relationship to a soap product, while Kodak is a fanciful (made-up) term for photography products.[29]

At the low end of the distinctiveness spectrum, generic marks receive no protection and descriptive marks "merit protection only if they have secondary meaning."[30] A mark can acquire

---

[20] *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 621 (5th Cir. 2023); *see also Xtreme Lashes*, 576 F.3d at 227.
[21] *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020) (quoting *Sun Banks of Fl. v. Sun Fed. Sav. and Loans Ass'n*, 651 F.2d 311, 311 (5th Cir. 1981)).
[22] *Xtreme Lashes*, 576 F.3d at 227.
[23] *Future Proof*, 982 F.3d at 291 (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 792 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 542 U.S. 111 (2004)).
[24] *Id.*
[25] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241 (5th Cir. 2010) (quoting *Zatarains*, 698 F.2d at 790-91).
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Extreme Lashes*, 576 F.3d at 227.

secondary meaning when it is "uniquely associated with a particular source."[31] The latter three categories on the spectrum—suggestive, arbitrary, and fanciful—are considered inherently distinctive.[32] Distinctiveness, however, does not necessarily equate to a mark's strength; a suggestive mark is not necessarily a strong mark.[33] Likewise, an arbitrary mark that is not well known in the market can be a weak mark.[34] On the other hand, a descriptive mark can become a strong mark through "vigorous promotion."[35] At bottom, distinctiveness only describes the relationship (or lack thereof) between the mark and the product or service provided.[36]

Standing in the marketplace refers to the extent of "third-party use of a term throughout the market suggest[ing] that consumers will not associate the junior mark's use with the senior mark user."[37] In other words, extensive use of a term by others weakens a mark.[38] All third-party use of the mark is relevant but is especially indicative if found in the same industry or type of service.[39] "[T]he key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff."[40]

"Nice guy" is not a generic term for a restaurant or nightclub, nor does it immediately convey the nature of such services. Thus, the mark is at least suggestive in that it requires some imagination by the customer to connect a colloquial term for a member of the mafia (a "nice guy") with an Italian restaurant reimagining the atmosphere of a mafia hangout.[41] But it does not qualify

---

[31] *Amazing Spaces*, 608 F.3d at 247.
[32] *Extreme Lashes*, 576 F.3d at 227.
[33] *Future Proof*, 982 F.3d at 290.
[34] *Id.*
[35] *Id.* (quoting RESTATEMENT (THIRD) UNFAIR COMPETITION § 21, cmt. I; *see also Sun Banks*, 651 F.2d at 315-17 (finding that an arbitrary mark ("Sun" in "Sun Banks") was a weak mark due to widespread third-party use).
[36] *See Sun Banks*, 651 F.2d at 315 ("Arbitrariness refers to the quality of a mark, i.e., that it bears no relation to the service provided.").
[37] *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 815 (5th Cir. 2019).
[38] *Id.*
[39] *Rex Real Estate*, 80 F.4th at 621.
[40] *Smack Apparel*, 550 F.3d at 479.
[41] R. Doc. 38-1 at ¶¶ 8-10.

5

as an arbitrary mark because there is a discernible connection between the phrase and the atmosphere and cuisine offered at The Nice Guy.

A&G submits evidence suggesting that the term "nice guy" appears in 76 active and inactive applications before the United States Patent and Trademark Office ("USPTO") and in numerous business names registered with the California, Florida, and Louisiana secretaries of state.[42] However, HWG notes that A&G identifies, at most, a single other restaurant or nightclub operating in the country with the phrase "nice guy" in its name—a pizza restaurant in Chicago that A&G's owner testified came up in Internet searches.[43] A dearth of businesses in the restaurant industry using the mark "nice guy" indicates that THE NICE GUY holds a strong place in the market.[44]

Considering the mark's strong standing in the market and, at least, suggestive descriptiveness, this digit weighs in favor of finding a likelihood of confusion.

ii. *Mark similarity*

When analyzing the similarity of two marks, courts consider "whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association."[45] The use of identical dominant words does not

---

[42] R. Doc. 35-1 at 8-9; *see also* R. Docs. 35-7 (California Secretary of State search results), 35-8 (Louisiana Secretary of State search results), and 35-9 (Florida Secretary of State search results).
[43] R. Doc. 39-2 at 7 (citing R. Doc. 38-3 at 16-17). With its reply, A&G submits new evidence of third-party use of "nice guy" in the restaurant industry, but that evidence is inappropriate to consider. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003) (finding that the district court abused its discretion in relying upon evidentiary materials presented for the first time in a reply brief).
[44] *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) ("[T]hird-party uses and registrations [outside of plaintiff's industry] merely limit the protection to be accorded plaintiff's mark *outside the uses to which plaintiff has already put its mark*.") (emphasis in original); *but see Sun Banks*, 651 F.2d at 316 (finding that extensive use of the mark, including in the names of a "significant number" of businesses in plaintiff's industry and state of operation, "impressive evidence that there would be no likelihood of confusion").
[45] *Xtreme Lashes*, 576 F.3d at 228.

necessarily equate to similarity between marks[46] because "[c]onfusion of origin, not the identity of marks, is the gravamen of trademark infringement."[47]

The Nice Guy and Nice Guys NOLA share the phrase "nice guy" in their names but use different typefaces and color schemes in most examples of their branding. The Nice Guy's logo reflects the restaurant's upscale atmosphere with a black and white color scheme, narrow typeface, and a monkey in a tuxedo hanging from the text.[48]

A&G directs the Court's attention to a version of Nice Guys NOLA's logo in an energetic white font over a dash of orange,[49] but HWG provides evidence that other iterations of Nice Guys NOLA's logo depart from that aesthetic.[50] One version includes the restaurant's name over a mostly black background, and it appears there is a large sign outside of Nice Guys NOLA featuring an image of a tuxedo and the restaurant's name in a font reminiscent of the font used in The Nice Guy's black and white logo.[51] Moreover, as HWG points out, a customer could conceivably interpret the use of "NOLA" in A&G's mark not as clarifying unaffiliated entities, but as denoting a New Orleans outpost of The Nice Guy.[52]

The variety of logos put before the Court requires weighing the aesthetic variations of Nice Guys NOLA's logos to arrive at a determination on this digit. That exercise is in the jury's province and prevents a summary judgment determination.[53]

iii. *Similarity of products and services*

---

[46] *Springboards*, 912 F.3d at 815.
[47] *Xtreme Lashes*, 576 F.3d at 229.
[48] *See* R. Doc. 35-1 at 10.
[49] *See id.* at 10.
[50] *See* R. Doc. 39-2 at 11-12.
[51] *See id.* at 12.
[52] *See id.* at 10 (citing *Xtreme Lashes*, 576 F.3d at 228).
[53] *Sun-Fun Prods., Inc. v. Suntan Rsch. & Dev. Inc.*, 656 F.2d 186, 190 (5th Cir. 1981) (determining similarity of marks a proper question for the jury despite identifiable similarities and differences).

"The greater the similarity between the products and services, the greater the likelihood of confusion."[54] When products or services are not competing with each other, the issue of confusion relates to sponsorship, affiliation, or connection.[55] The likelihood of a consumer perceiving affiliation between two marks increases when the junior mark appears in a market in which the senior mark would naturally expand.[56] Whether the senior user actually intends to expand into that market is immaterial—consumer perception is the controlling factor.[57]

The Nice Guy and Nice Guys NOLA do not directly compete with each other—they are located in cities separated by roughly two thousand miles—but it is conceivable that HWG could expand its locations of the Nice Guy to New Orleans, where Nice Guys NOLA is located. Thus, the question for this digit is whether The Nice Guy and Nice Guys NOLA provide sufficiently similar services such that potential customers might believe the two restaurants are affiliated.

There are at least superficial differences in the "services" the two restaurants provide: Nice Guys NOLA sells New Orleans-style food "with all the vibes";[58] The Nice Guy sells Italian food and the chance of spotting A-list celebrities.[59] Naturally, A&G latches onto the different cuisines as sufficiently distinguishing the two restaurants,[60] while HWG argues for a quasi-categorical approach, grouping restaurants as similar service providers.[61]

Considering an appeal from a post-trial judgment as a matter of law in favor of the defendant, the Fifth Circuit in *Rex Real Estate* weighed the similarities between two real estate brokerage services.[62] The plaintiff primarily dealt in commercial sales, while the defendant

---

[54] *Exxon Corp. v. Tx. Motor Exch. of Hous.*, 628 F.2d 500, 505 (5th Cir. 1980).
[55] *Rex Real Est.*, 80 F.4th at 622 (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998)).
[56] *Id.*
[57] *Id.*
[58] R. Doc. 35-14 at ¶ 4.
[59] *See* R. Doc. 38-1 at ¶¶ 11-12.
[60] R. Doc. 35-1 at 12-13.
[61] R. Doc. 39-2 at 13 (citing *Elvis Presley Enters.*, 141 F.3d at 202).
[62] 80 F.4th at 622-23.

catered exclusively to prospective homeowners purchasing single family homes.[63] There was no evidence that the plaintiff intended to expand its operations into brokerage of single-family homes; nevertheless, the question before the Fifth Circuit was "whether the consuming public would believe that the natural tendency of brokers involved in commercial and investment real estate is to expand into the brokerage of single-family homes."[64] Thus, despite the unlikelihood that the plaintiff would expand beyond its traditional commercial and investment real estate brokerage into the single-family homes brokerage market, the Fifth Circuit found that a reasonable jury could have concluded otherwise.[65]

*Rex Real Estate* instructs that targeting different subsections of the same market is not dispositive on this digit. The Nice Guy and Nice Guys NOLA arguably provide very different restaurant experiences. But a jury could reasonably conclude that an expansion of The Nice Guy to New Orleans would take on features similar to Nice Guys NOLA, including New Orleans-style cuisine and a boisterous atmosphere. A reasonable jury could weigh this factor in HWG's favor.

iv. *Outlet and purchaser similarity*

The less overlap between retail outlets and predominant customers of the two businesses, the smaller the possibility of confusion.[66]

In the broadest sense, there is overlap between the two restaurants' potential customers—California residents who might travel to New Orleans on vacation and "celebrities," a clientele both restaurants hope to attract. But, as HWG acknowledges, the geographic distance between New Orleans and West Hollywood suggests that there is little, if any, direct overlap in customers. This digit weighs against finding a likelihood of confusion.

---

[63] *Id.*
[64] *Id.*
[65] *Id.* at 623.
[66] *Exxon*, 628 F.2d at 505.

9

    v.    *Advertising media identity*

The greater the similarity between the parties' advertising campaigns, the greater the likelihood of confusion.[67] Using the same advertising channel or publication may weigh in favor of finding a likelihood of confusion but is not necessarily dispositive on this digit.[68]

Both parties advertise on social media, primarily on Instagram.[69] Instagram posts from Nice Guys NOLA's account show large groups of people dancing in the restaurant and on the street outside.[70] The Nice Guy's Instagram account, meanwhile, focuses on close-up pictures of delicate cocktails and pasta dishes alongside portraits of actors known for their roles in mafia movies.[71] Apart from both restaurants advertising on Instagram and any similarities between the actual marks, nothing about their advertising strategies suggest the two restaurants share any affiliation. This digit weighs against finding a likelihood of confusion.[72]

    vi.    *Defendant's intent*

Courts consider whether the defendant intended to derive benefits from the reputation of the plaintiff.[73] "If there is no evidence of [the defendant's] intent to confuse," as is the case here, "then this factor is neutral."[74]

---

[67] *Id.* at 506.
[68] *Id.* (common use of radio, television, newspaper ads, yellow page ads, and large signs constituted "substantial identity of advertising media"); *but see Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 172-73 (5th Cir. 1986) ("Many trademarks are advertised side-by-side in the same publications, but the public does not assume from this fact alone that the products have a common origin.").
[69] A&G also asserts that HWG "advertises in InStyle, Haute Living, Page Six, Vogue, USA Today, the New York Times, and Harper's Bazaar," citing HWG's Complaint. *See* R. Doc. 35-1 at 13 (citing R. Doc. 1 at 4). But HWG's Complaint only states that The Nice Guy has been mentioned in those publications, not that it has paid those publications for advertising. *See* R. Doc. 1 at ¶ 13 ("The restaurant is well-known both within Los Angeles and nationally, having been prominently featured in national publications like Page Six, Vogue, USA Today, the New York Times, and Harper's Bazaar.").
[70] R. Doc. 35-11.
[71] R. Doc. 35-5 at 22.
[72] *See Oreck Corp.*, 803 F.2d at 173 ("Given the only slight resemblance of the marks to each other when viewed in context, the likelihood of confusion from the advertising is negligible. Many trademarks are advertised side-by-side in the same publications, but the public does not assume from this fact alone that the products have a common origin.").
[73] *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir. 1984), *abrogated on other grounds by TrafFix Devices v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001)).
[74] *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 195 (5th Cir. 2018).

    vii.    *Actual confusion*

The best evidence of likelihood of confusion is actual confusion.[75] Actual confusion can be shown with anecdotal instances of confusion or systematic customer surveys.[76] "Testimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion"[77] and "an almost overwhelming amount of proof [is required] to refute" evidence of actual confusion.[78] In some cases, the Fifth Circuit has required that evidence of actual confusion include proof that the confusion swayed consumer purchases.[79] In others, mere offhand remarks have qualified.[80] "Even if initial consumer confusion is quickly dispelled, this initial misunderstanding is evidence of confusion."[81]

The seed of this lawsuit was planted when a customer of THE NICE GUY "wrote to the company to inform its management of the defendant's Nice Guys NOLA restaurant and to ask whether it was affiliated with the H. Wood Group[,] . . . express[ing] confusion as to whether the two were affiliated."[82] As A&G notes, HWG has not submitted evidence of the actual communication at issue, but that is not a bar to considering it at the summary judgment stage.[83] Viewed in the light most favorable to HWG, as the non-movant, this incident constitutes an example of actual consumer confusion.[84]

---

[75] *Smack Apparel*, 550 F.3d at 483 (citing *Elvis Presley Enters.*, 141 F.3d at 203).
[76] *Rex Real Est.*, 80 F.4th at 623 (quoting *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017)).
[77] *Streamline*, 851 F.3d at 457 (citing *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)).
[78] *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 230).
[79] *Id.*
[80] *Viacom*, 891 F.3d at 197.
[81] *Id.*
[82] R. Doc. 35-4 at 5.
[83] *See D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018) ("At the summary judgment stage, evidence relied upon need not be presented in admissible form but it must be '***capable*** of being presented in a form that would be admissible in evidence.'") (quoting *LSR Consulting, LLC v. Well Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original)).
[84] *See Viacom*, 891 F.3d at 197.

A&G engaged an expert, David Franklyn, to conduct an "Eveready" study of past or prospective visitors of restaurants in New Orleans.[85] The study was conducted by asking participants to look at images from Nice Guys NOLA's website and social media page.[86] Participants in the test group reviewed images including the name "Nice Guys NOLA," while those in the control group saw the same images but with the words "Nice Guys" replaced by "Good Guys."[87]

Franklyn determined that only one respondent of the 212 in the test group indicated that they believed they saw images related to The Nice Guy in West Hollywood.[88] Other respondents expressed a familiarity with the Nice Guys NOLA restaurant, identifying the area in New Orleans where it is located.[89] Of the control group respondents, Franklyn represented that none identified the fictional "Good Guys" as related to The Nice Guy in West Hollywood.[90] Moreover, none of the survey respondents from California indicated confusion between Nice Guys NOLA and The Nice Guy.[91] Based on the foregoing, Franklyn concluded there was a net aggregate confusion of 0.5%.[92]

Franklyn's deposition testimony, however, injects some doubt into his determinations. As detailed in HWG's opposition brief, in addition to the one confused respondent described in Franklyn's report, at least two other respondents arguably expressed confusion as to the location of Nice Guys NOLA, identifying it as a restaurant in Los Angeles, not New Orleans.[93] And, as HWG also points out, survey respondents were not shown any of the variations of Nice Guys

---

[85] *Id.* at 16-17.
[86] R. Doc. 35-13 at 18.
[87] *Id.*
[88] R. Doc. 35-13 at 33-34.
[89] *Id.* at 34.
[90] *Id.*
[91] R. Doc. 35-1 at 17-18.
[92] *Id.* at 35.
[93] *See* R. Doc. 39-2 at 16; *see also* R. Doc. 38-6 at 106-07, 111-12.

NOLA's branding that more closely resembles The Nice Guy's, nor any actual examples of The Nice Guy's branding.[94]

In *Sun Banks*, the Fifth Circuit determined that fewer than fifteen reported incidents of confusion over three years was not dispositive evidence as to this digit.[95]  And in *Amstar*, "the fact that only three instances of actual confusion were found after nearly fifteen years of extensive concurrent sales . . . raise[d] a presumption against likelihood of confusion in the future."[96]  Likewise, the Fifth Circuit in *Society of Financial Examiners* found that twelve examples of actual confusion over a five year period "refute[d] the likelihood of confusion"[97]

The single documented incident of real-world confusion does not weigh strongly in HWG's favor.  Yet, the flaws in the survey evidence submitted by A&G render that evidence insufficient to overcome the documented incident of real-world confusion.[98]  Accordingly, this factor weighs slightly in HWG's favor.

viii.    *Degree of care exercised by potential purchasers*

When an item is relatively inexpensive, purchasers are likely to exercise a lesser degree of care, creating greater risk of confusion.[99]  "Confusion on the part of *either* party's customers matters, not just confusion on the part of those seeking the senior user's goods."[100]  As both parties acknowledge,[101] dining out is relatively inexpensive, at least when compared to the kinds of

---

[94] *See* R. Doc. 35-13 at 19-21 (images shown to respondents in the test group).
[95] 651 F.2d at 319.
[96] 615 F.2d at 263.
[97] *Society of Financial Examiners v. Nat'l Ass'n of Certified Fraud Examiners Inc.*, 41 F.3d 223, 228 (5th Cir. 1995).
[98] *See, Viacom*, 891 F.3d at 197-98 (weighing this digit in favor of plaintiff after considering one documented incident of confusion and defendant's "flaw[ed]" study showing 30-35% of respondents expressing confusion between the marks).
[99] *Smack Apparel*, 550 F.3d at 483.
[100] *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 656 (N.D. Tex. 2022) (emphasis in original) (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985)).
[101] *See* R. Doc. 35-1 at 18 ("Restaurants are relatively inexpensive purchases; however, it is likely that the plaintiff A-list celebrity clientele exercises a high degree of care in choosing where to dine and seek the type of privacy that is the focus of Plaintiff's advertising."); R. Doc. 39-2 at 17 ("Here, defendant acknowledges that dining out is relatively expensive [sic].").

purchases that the Fifth Circuit has typically considered worthy of deliberation.[102] Although there is no evidence in the record as to the average cost of a customer visit to either restaurant, The Nice Guy undoubtedly markets itself as a premium, exclusive experience. This suggests its customers could potentially be more diligent in choosing restaurants than the average consumer.

Given the sparsity of evidence on this digit and the countervailing arguments, this digit provides little insight.

   ix.  *Weighing the digits of confusion*

No digit is dispositive and a likelihood of confusion can be found even where a majority of the factors do not weigh in favor of such a finding.[103] While there are some digits that weigh against finding a likelihood of confusion, that result is not "preordained" as there is evidence to support a reasonable jury's verdict for HWG.[104] A&G's motion for summary judgment must, therefore, be denied as to HWG's trademark infringement claim.

   **B. Lanham Act damages**

The Lanham Act provides for the recovery of monetary damages in the form of (1) the defendant's profits, (2) the plaintiff's damages, and (3) the costs of the action.[105] Monetary damages should only be awarded if an injunction does not satisfy the equities of the case.[106] This is particularly true in the absence of evidence that the defendant held a wrongful intent.[107]

HWG does not respond to A&G's argument that HWG's complaints can be addressed through injunctive relief because there is no evidence of damages or loss of sales.[108] Because it

---

[102] *See, e.g.*, *Streamline*, 851 F.3d at 458 (describing custom fabricated natural gas processing equipment priced at $100,000 as "very expensive").
[103] *Future Proof*, 982 F.3d at 298.
[104] *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs Inc.*, 41 F.3d 223, 226 (5th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[105] 15 U.S.C. § 1117(a).
[106] *Sea Trax Inc. v. Sonbeck, Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000).
[107] *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 917 (Fed. Cir. 1984).
[108] *See* R. Doc. 35-1 at 19-20.

appears the motion has merit as to this claim, summary judgment is granted as to HWG's claim for monetary damages.

### C. Trademark dilution

A claim under the Trademark Dilution Revision Act of 2006 ("TDRA") requires a plaintiff to show (1) the plaintiff owns a famous and distinctive mark; (2) the defendant commenced using a mark in commerce that is allegedly diluting the famous mark; (3) the similarity between the marks gives rise to an association between the marks; and (4) the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.[109]

A&G argues that there is no evidence that HWG's mark is sufficiently famous to be entitled to protection under the TDRA.[110] HWG also fails to respond to this argument, and, based upon a review of the applicable law and all the relevant evidence, summary judgment is, therefore, granted as to HWG's trademark dilution claim.

## IV.   CONCLUSION

For the foregoing reasons, A&G's motion for summary judgment **GRANTED IN PART** and **DENIED IN PART**.

New Orleans, Louisiana, this 28th day of January 2025.

_____
**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**

---

[109] *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264-65 (4th Cir. 2007).
[110] *See* R. Doc. 35-1 at 20-21.